UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| SCOTT AND CINDY JOHNSON,<br>Individually & as Parents & Next Friends of<br>Minor A. J.,<br><br>v.<br><br>L.B.O. HOLDING, INC. d/b/a ATTITASH<br>BEAR PEAK RESORT & ATTITASH<br>RESORT;<br>PEAK RESORTS, INC., d/b/a ATTITASH<br>BEAR PEAK RESORT & ATTITASH<br>RESORT;<br>ROSS A. STEVENS, d/b/a STEVENS<br>ENGINEERING;<br>BOUNCE BACK, LLC, d/b/a U.S. AIRBAG;<br>and<br>U.S. AIRBAG, LLC, d/b/a U.S. AIRBAG | Civil Case No.: 1:17-cv-00277 |

**DEFENDANTS L.B.O. HOLDING, INC. AND PEAK RESORTS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS**

NOW COME Defendants L.B.O. Holding, Inc., d/b/a Attitash Bear Peak Resort and Attitash Resort ("Attitash"), and Peak Resorts, Inc., d/b/a Attitash Bear Peak Resort and Attitash Resort ("Peak Resorts") (collectively the "Attitash Defendants"), and respectfully submit the following Memorandum of Law in Support of Motion for Summary Judgment on Plaintiffs' Claims.

**I.      INTRODUCTION**

The Attitash Defendants base this motion on the straightforward application of the relevant laws to Plaintiffs' claims in their Complaint and the underlying support for Plaintiffs' claims as revealed through discovery and judged by the applicable standard of "in the light most favorable to the plaintiffs." As explained in detail below, Plaintiffs' claims against the Attitash

Defendants generally fail for lack of evidence; lack of proof of causation; the absence of expert testimony required to support some of the claims and because the applicable law does not allow the recovery Plaintiffs' seek as to some of their claims.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.    Plaintiffs assert, through their Complaint (and the Attitash Defendants agree), that on July 3, 2014, they traveled to New Hampshire for purposes of a family vacation that included a visit to Attitash Resort in Bartlett, New Hampshire.  (Complaint ¶ 13.)

2.    Plaintiffs revealed through their recent deposition testimony[2] that between the two of them, only one, Scott Johnson, looked at any Attitash marketing materials or any other forms of Attitash-generated information or documents prior to using Attitash's airbag attraction.  This includes, but is not limited to: social media postings, online videos, and print and television advertisements.  Scott indicated that before their arrival at Attitash Resort, he reviewed the Attitash Resort website to book a room at the Attitash Grand Summit Hotel and to get a sense of the various types of attractions that were available at Attitash Resort that summer.  However, he testified that he could not recall any specifics about any particular attractions.  Moreover, when he was presented with the Attitash-related marketing materials that Plaintiffs produced with their Rule 26(a)(1)(A) Initial Disclosures, Scott testified that he did not see or review any of that material prior to the subject accident.[3]

---

[1] *See* LR 56.1(a).  The Attitash Defendants expressly reserve the right to contest any and all of Plaintiffs' alleged undisputed facts, if necessary.

[2] Plaintiffs were deposed on October 18 and 19, 2018.  The depositions included the Plaintiffs themselves, A.J., and her brother, Christopher.  The transcripts are not yet available.  As soon as they are, the relevant pages from those transcripts supporting this Statement of Undisputed Material Facts and the rest of this Memorandum will be identified.  The Attitash Defendants will then submit an annotated copy of this Memorandum that contains all of the appropriate record citations and attaches the supporting excerpts from the cited depositions.  This should happen before Plaintiffs' Objection is due.

[3] He did testify that he may have reviewed Attitash's summer brochure when they arrived at Attitash.

3. Shortly after Plaintiffs and their two children, A.J. and Christopher, arrived at Attitash Resort, the children saw and expressed an interest in using the "Airbag Jump" attraction.

4. The Airbag Jump attraction is a freefall attraction that features a specially-designed airbag, which Attitash acquired from a third-party supplier, co-Defendant U.S. Airbag, LLC, that is positioned on the ground in front of a scaffolding structure that features two jump platforms at different heights. An Attitash Resort patron using the Airbag Jump attraction ascends stairs on the scaffolding structure and first jumps from the lower jump platform onto the airbag below. *See* Attitash Photographs, attached to Declaration of J. Eck as Exhibit A. A patron who successfully completes a jump from the lower jump platform is permitted, but not required, to take subsequent jumps from either the lower or the upper jump platform.

5. The scaffolding structure for the Airbag Jump features a cantilevered design, such that the jump platform extends out from the scaffolding structure, out over and above the airbag that is positioned below. *See* Ex. A, Attitash Photographs.

6. Attitash Resort patrons using the Airbag Jump receive instructions from Attitash attendants in the course of using the attraction. Additionally, there are multiple prominently placed signs that provide further instructions and limitations with regard to use of the Airbag Jump.

7. Patrons are specifically instructed not to grab any part of the scaffolding structure when jumping. A sign that was posted both at the entry gate to the attraction and at the lower jump platform instructs each patron that they are prohibited from "Holding onto Safety Hand Rail While Preparing to Jump." *See* Attitash Sign Photographs, attached to Declaration of J. Eck as Exhibit B. Another sign, which was positioned next to the first sign in multiple locations at

the time of the subject accident, provides a visual depiction of how a patron should jump onto the airbag.  *See id.*

8. A.J., age 9 years old at the time, decided that she wanted to use the Airbag Jump. A.J. and her older brother, Chris, stood in line to use the attraction.  After Chris successfully jumped from the lower jump platform, A.J. took her turn and attempted to follow his example.

9. However, once on the lower jump platform, A.J. made two attempts to jump off the lower jump platform, both of which resulted in A.J. aborting her jumps once she neared the edge of the platform.  A.J. then walked down from the platform and abandoned her attempt to use the Airbag Jump attraction.

10. A few minutes later, A.J.'s father, Plaintiff Scott Johnson, successfully completed a jump from the lower platform.  Nevertheless, Scott testified at his deposition that his jump attempt had nothing to do with encouraging A.J. to use the attraction.

11. More minutes later, following her father's jump, once again, A.J. stood in line for another chance to use the Airbag Jump.  She ascended the stairs to the lower jump platform, again received instructions from the Attitash attendant, and began her approach for another jump attempt.  A.J. advanced toward the edge of the platform by coming straight down the middle of the platform.  However, at the very last instant before it appeared her feet would leave the platform, she veered to her left in the direction of the platform's side railings and post.  A.J. grabbed ahold of the vertical post in front of the railing to her left, while her forward/side momentum brought her off the platform at a 45 degree angle.  She proceeded to swing partway around the scaffolding post before she lost her grip and fell.  *See* Screenshots of Plaintiffs' video footage of A.J.'s jump, marked as Exhibit 11 at Cindy Johnson's deposition and attached to

4

Declaration of J. Eck as Exhibit C.  A.J. landed either partially on the airbag below or on the pavement beneath the five-foot cantilevered Airbag Jump platform.

12. During his recent deposition, Plaintiff Scott Johnson acknowledged that since this summer his daughter, A.J., owns a mountain bike with a $5,000 retail value.  He admitted that A.J. frequently rides on single track and double track mountain biking trails near their home, and she also participated with him in downhill mountain biking at a lift-serviced mountain biking resort.

13. Mountain biking is a high-risk activity.  Head injuries are common.  *See* Table 2, page 1340, Centers for Disease Control and Prevention, Nonfatal Traumatic Brain Injuries Related to Sports and Recreation Activities Among Persons Aged ≤19 – United States, 2001–2009, MMWR 2011; 60:1340 (Oct. 7, 2011), attached to Declaration of J. Eck as Exhibit D.

14. In addition to mountain biking, about two years after her July 3, 2014 accident, A.J. played for a season on her school's soccer team.  She did not wear a helmet while doing so.  Soccer is also a high-risk activity for children with a high risk of head injury.  *See id.*

### III. ARGUMENT

#### A. Legal Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this rule, a dispute is "genuine" if it can "be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case."  *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

> **B.     A.J.'s Claim That Her Subject Head Injury Could Result in Serious Future Life-Threatening Conditions Fails For Lack of Required Expert Testimony and Supporting Medical Evidence.**

Part of Plaintiffs' damages claims includes a contention, made for the first time as part of their August 31, 2018 medical expert disclosure, that one of her treating physicians, Dr. Neilson, may offer testimony relating to the increased risks that A.J. faces as a result of her injuries, including "increased risks relating to her head injury, including mental illness, dementia, ALS, ALS [sic], and CTE" (emphasis supplied).  Plaintiffs have a similar, but shorter, disclosure for Dr. Rughani.  However, Plaintiffs have not disclosed any expert who provides that opinion in any report or in their records of A.J.'s treatment.  Plaintiffs' medical experts consist only of several of A.J.'s treating physicians, who were disclosed without any written reports as non-retained experts.  Although non-retained experts do not need to provide Rule 26(a)(2)(B) reports, *see Aumand v. Dartmouth Hitchcock Med. Center*, 611 F. Supp. 2d 78, 88 (D.N.H. May 1, 2009), such experts must be disclosed in accordance with Rule 26(a)(2)(A).  *Id.* at 88.  Treating physicians disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(A), as opposed to Rule 26(a)(2)(B), are limited to testifying as to what they saw and what they did.  They cannot provide opinions beyond those expressed within the four corners of the patient's medical records.  *See Vosburgh v. Bourassa*, 2008 U.S. Dist. LEXIS 60028, at *7 (D.N.H. Aug. 5, 2008) (holding that absent an expert report, a plaintiff's treating physician cannot testify to opinions "based on information not learned during the course of treatment," e.g., information in a hypothetical posed by counsel (quotation omitted)); *Holm v. Town of Derry*, 2011 U.S. Dist. LEXIS 146606, at *19 (D.N.H. Dec. 20, 2011) ("Treating physicians may not provide opinions, however, beyond those formed during their treatment of their patient that are reflected in their treatment notes.").  In none of A.J.'s medical records (created prior to Plaintiffs' expert disclosure deadline) is there any

6

<u>suggestion that she may develop mental illness, dementia, ALS or CTE in the future.</u>  In fact, these records do not disclose any ongoing problems or possible future problems, once A.J. was fully recovered from her injuries in 2014, other than some hearing loss at certain ranges in her right ear.

It is also noteworthy that while Plaintiffs claim to have fears of A.J.'s supposed increased vulnerability to concussions and her potential to develop the above conditions, during Plaintiffs' recent depositions, it was revealed that two years after her July 3, 2014 accident, A.J. played a full season on her school's soccer team without wearing a helmet.  Additionally, Plaintiff Scott Johnson testified that A.J. owns a mountain bike that she frequently rides on single track and double track mountain biking trails near their home, and on one occasion she has even gone downhill mountain biking at a lift-serviced mountain biking resort with him.  Such inherent risk activities as youth soccer and mountain biking, both of which have high incidence of head injuries, completely undermines Plaintiffs' professed fears of A.J. being at risk for developing mental illness, dementia, ALS or CTE in the future.

Because the Plaintiffs lack a retained expert who, based on her medical records, can testify to a reasonable degree of medical probability that A.J. will develop mental illness, dementia, ALS or CTE and specifically tie these claims to her July 3, 2014 accident, Defendants are entitled to summary judgment on Plaintiffs' claims for damages that A.J. "may" be at an "<u>increased risk</u>" of developing any of these conditions in the future.

### C. All of Plaintiffs' Claims Fail in General For Lack of Required Evidence of Causation.

Plaintiffs maintain that the cause of A.J.'s accident was that Attitash did as follows:

- "failed . . . to follow the State of New Hampshire's recommendations [following a prior accident at the Airbag Jump attraction]," including "to cover the corner

7

- posts [on the scaffolding structure's jump platform] with something that is not easily grabbed by participants and consider giving participants something to hold in their hands to prevent exactly this type of accident" (Complaint ¶ 31; *id.* ¶ 30);

- "failed to position the airbag so that the AIRBAG Jump tower platform extended at least 5' over the airbag and unreasonably erected the airbag further away from the base of the scaffolding tower than what good practices required" (*Id.* ¶ 32);

- "failed to install any padding on the hard surfaces below and surrounding the jump platform" (*Id.* ¶ 33); and

- "did not warn A.J. that she should not jump if she was scared or that there was any risk of her hitting the concrete if she did not sufficiently propel herself forward." (*Id.* ¶ 34).

Plaintiffs are unable to establish that any of the above alleged failures were the <u>cause</u> of this accident. It is black letter law that "proximate cause is a necessary element of negligence," in addition to being a necessary element in a strict liability or products liability claim. *LeFavor v. Ford*, 135 N.H. 311, 313 (1992). The cause of A.J.'s July 3, 2014 accident at Attitash was A.J. somehow falling approximately five feet beneath the cantilever overhang for the lower Airbag Jump platform and landing[4] in an area where no patron had ever landed before and in an area where a patron is not expected or supposed to land. A.J.'s use of the attraction—where she attempted to abort her jump from the lower Airbag Jump platform, was unable to successfully do so, swung herself around a pole that was part of the scaffolding structure, and consequently fell to the unexpected location below—is contrary to how the attraction is designed and intended to be used. Moreover, taking into account basic physics, the design of the attraction, and the fact

---

[4] There is a factual dispute as to whether A.J. hit the airbag first or instead missed the airbag altogether and solely made contact with the ground.

8

that no other patron had ever landed off the airbag, it was unforeseeable to Attitash that a patron could fall there.

Plaintiffs, through their retained liability expert Corey Andres, fault Attitash for what they contend was a failure to position the airbag directly against and in contact with the bottom portion of the airbag scaffolding structure.  Andres report, attached to Declaration of J. Eck as Exhibit E, at 12-15.  Mr. Andres opines that the placement of the airbag relative to the base of the scaffolding "increased the risk of injury to Ally."  Ex. E, Andres report, at 15; *see also id.* at 18.  However, an "increase in risk" is insufficient to satisfy Plaintiffs' burden to prove causation.  *Bronson v. Hitchcock Clinic*, 140 N.H. 798, 809 (1996) ("The principles governing causation require that the defendant's conduct be both the cause-in-fact of the plaintiff's harm and a substantial factor, rather than a slight one, in producing that harm." (quotation omitted)).  The required standard is that the allegedly negligent conduct must be a "substantial factor" that is causal of the injury.  *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 414 (2004) ("[L]egal cause requires the plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm."); *Demetracopoulos v. Wilson*, 138 N.H. 371, 377 (1994) (same); Restatement (Second) of Torts § 431 (1965).  Plaintiffs cannot meet that standard because their own liability expert's report falls far short of expressing that required opinion.

Under the circumstances of A.J.'s accident, there can be no genuine dispute that the substantial contributing factor was her own aborted jump attempt and her act of grabbing the side pole of the scaffolding structure after she initiated her jump.  Attitash's placement of the airbag itself was not causal of A.J.'s grabbing the side pole of the scaffolding, her resultant altering of her trajectory off the scaffolding structure, and her ultimate fall to the edge of the airbag or ground below.

9

Furthermore, even if <u>an increase in the risk of injury</u> were enough to satisfy the causation requirement, the Plaintiffs do not have competent medical evidence that A.J. would have been <u>less injured</u> if the airbag was touching the scaffolding structure. Thus, Plaintiffs are without evidence required to prove causation and all of their claims should be dismissed.

As concerns Plaintiffs' negligence claims that the Attitash Defendants "failed to install any padding on the hard surfaces below and surrounding the jump platform" (Complaint ¶ 33) and that the Attitash Defendants "did not warn A.J. that she should not jump if she was scared or that there was any risk of her hitting the concrete if she did not sufficiently propel herself forward" (*Id.* ¶ 34), Plaintiffs' liability expert does not express any opinions on those matters, let alone address them, in his expert report. *See generally* Ex. E, Andres Report. Expert testimony is required on these matters—specifically as to whether these are duties actually owed by Attitash and, to the extent they allegedly were, if they were breached. It is worth noting that these two claims are not covered by any of the ASTM amusement devices rules that Plaintiffs' expert claims are authoritative. *See id.* at 15-17. Thus, because these two claims are beyond the ken of the average layperson and lack expert support they should be dismissed. *Lemay v. Burnett*, 139 N.H. 633, 634 (1995); *Estate of Joshua T. v. State,* 150 N.H. 405, 408 (2003) (*quoting Powell v. Catholic Med. Ctr.*, 145 N.H. 7, 14 (2000)). Additionally, failure to install padding on the ground below the scaffolding is not causal, and therefore it is not grounds for which Attitash could be held liable for A.J.'s accident.

**D.    Plaintiffs' CPA Claim Fails For Lack of Causation.**

In support of their Consumer Protection Act claim, Plaintiffs assert that the Attitash Defendants made the following misrepresentations to them:

- stating . . . that the airbag was designed to give a soft landing";
- "labeling the airbag 'soft landings for superheroes'";

- "stating . . . that the airbag was 60' by 60' when it was no more than 50' by 50'"; and
- "stat[ing] that [the airbag] 'will provide a soft landing for thrill seekers'".

(Complaint ¶¶ 63-64, 16; *see also id.* ¶¶ 15, 17.)  However, Plaintiffs have not produced any evidence that there is anything false or deceptive about the representation that the airbag "was <u>designed</u> to give a soft landing" (emphasis added) or that the airbag "will provide a soft landing for thrill seekers."  That was obviously the very intent of the device.  There is no misrepresentation or unfair and deceptive advertising with regard to that statement.  As for the statement "soft landings for superheroes," that is printed on the side of the airbag and is a U.S. Airbag slogan, not a statement from either of the Attitash Defendants.  *See* Ex. A, Airbag Photographs.

At their recent depositions, Plaintiffs conceded that they did not review any marketing documents or advertising material from Attitash before using the Airbag Jump attraction.  Only Plaintiff Scott Johnson indicated that before his family's arrival at Attitash Resort, he reviewed the Attitash <u>website</u> in order to get a sense of the various types of attractions that were available at Attitash that summer, but he could not recall any specifics about any particular attraction.  Moreover, he could not identify any of the specific documents Plaintiffs produced with their Rule 26(a)(1)(A) Initial Disclosures, <u>which are supposed to consist of all of the documents that Plaintiffs rely on in support of their claims</u>, as documents that he reviewed before he or anyone else in this family, including A.J., used the Airbag Jump attraction.[5]

Plaintiff Cindy Johnson confirmed in her deposition that she had not reviewed any of the alleged Attitash marketing documents Plaintiffs' produced with their Rule 26(a)(1)(A) Initial Disclosures and she did not do any of the planning or research for this family vacation before

---

[5] All of these documents (that bear a date) were printed out in 2016 or later, well after the subject accident.

11

A.J.'s accident at Attitash. Thus, it was established that those documents were assembled by Plaintiffs' counsel, through Internet searches <u>years after the fact</u>, to try to manufacture support for a lawyer-created, post-accident-constructed CPA claim.

Most importantly, it is undisputed that A.J. did not look at any Attitash marketing or advertising material prior to her accident. Therefore, there can be no alleged false or deceptive representations by Attitash that she was exposed to. She testified that she was unaware of the airbag until she saw it at Attitash and that she wanted to jump from it because it looked like fun.

The Attitash Defendants are entitled to summary judgment on Plaintiffs' CPA claim because there is no causal relationship between the harm that A.J. alleges was suffered and the purported misrepresentations by Attitash. In order to state a CPA claim, A.J. must prove "a causal link between the conduct at issue [including the underlying the CPA claim] and his or her injury." *Mulligan v. Choice Mort. Corp. USA*, 1998 U.S. Dist. LEXIS 13248, at *35 (D.N.H. Aug. 11, 1998); *see also* RSA 358-A:10, I (stating that "<u>[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter</u> may bring an action for damages . . ." (emphasis added) and thus expressly establishing in the statute a causation requirement for a CPA claim). Given A.J. and her parents' inability to prove that they reviewed any specific Attitash marketing materials before their arrival at Attitash Resort and use of the Airbag Jump attraction, it must follow that Plaintiffs cannot prove that any representation or alleged misrepresentation by the Attitash Defendants caused A.J. to use the Airbag Jump attraction, resulting in her subsequent injuries and Plaintiffs' damages claims.

Moreover, even if Plaintiffs had seen the aforementioned marketing materials that their legal counsel assembled in support of their claims almost two years post-accident, none of the representations in the marketing materials were causal of A.J.'s accident. Although Plaintiffs

12

allege that "Defendant Attitash unfairly and deceptively advertised their [sic] products and services in violation of NH RSA 358-A:2 by stating *inter alia* that the airbag was 60' by 60' when it was no more than 50' by 50'" (Complaint ¶ 64), there is no credible claim that the size of the airbag at Attitash or any related representations by the Attitash Defendants had anything to do with A.J.'s aborted jump attempt, her subsequent fall, and her landing. Plaintiffs do not allege, for example, that A.J.'s accident would not have happened if Attitash was more precise in advertising the size of the subject airbag. Nor could Plaintiffs credibly make such an allegation, particularly where A.J.'s use of the Airbag Jump attraction was contrary to its design and instructions and where she altered her trajectory off the jump platform such that she somehow swung herself under the five-foot cantilevered jump platform and fell close to the base of the scaffolding structure. It is also significant, on this alleged misrepresentation as to the size of the airbag, that Plaintiffs' liability expert, Corey Andres, never discusses this alleged misrepresentation, and thus why this was a misrepresentation or what effect it had on A.J. or the subject accident. *See* Ex. E, Andres report. In the absence of any evidence of the required causal relationship, Plaintiffs do not have a viable CPA claim against either of the Attitash Defendants.

> **E. Plaintiffs' Strict Products Liability/Defective Design/Defective Product Claim Against Attitash Fails Because the Provision of the Airbag Jump Attraction Was a Service (as Opposed to a Product) and, Separately, Their Daughter Misused the Attraction.**

The Attitash Defendants are entitled to summary judgment on Plaintiffs' Count II strict products liability and defective design/defective product claim because Plaintiffs and their daughter, A.J., did not purchase a product from Attitash, but rather paid for a service.[6] Plaintiffs allege that "Defendants sold the AIRBAG Jump ride and attraction to the Johnsons[,] including

---

[6] Even if, as Mr. Andres contends, the Court construes Attitash as the "manufacturer" of the Airbag Jump attraction, *see* Ex. E, Andres report, at 10, Ally was buying a service and not an airbag and scaffolding device from Attitash.

13

A.J." (Complaint ¶ 54), and they maintain that they were "consumers of the AIRBAG Jump." (*Id.* ¶ 53.) There can be no genuine dispute that the Attitash Defendants did not <u>sell</u> the attraction itself to Plaintiffs (and thus did not sell a product), but rather sold them wristbands that allowed them access to <u>use</u> the Attitash Defendants' <u>service</u> of running the attraction for Plaintiffs and their children to <u>use</u>. (*See also id.* ¶ 57 (referring to "A.J.'s use of the AIRBAG Jump").)

Under New Hampshire law, strict liability in tort applies to persons engaged in selling <u>products</u> for use or consumption, but it does not apply to a supplier of <u>services</u>. *See Dudley v. Business Express, Inc.*, 882 F. Supp. 199, 210 (D.N.H. 1994) (holding that, under New Hampshire strict products liability law, "liability will not attach to one who acts as a supplier of services"); *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730 (1984) (affirming the trial court's dismissal of the plaintiff's products liability claim because the defendant "provides persons with a service; namely, a ride on a machine"); *Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 568 (1977) (holding that the provider of a service, in that case, transportation up the mountain at the Mt. Cranmore ski area using a passenger tramway, cannot be held strictly liable in tort in the way that persons in the business of selling products can).

The New Hampshire Supreme Court "has been extremely reluctant to expand the doctrine of strict products liability beyond traditional bounds." *Croteau v. Olin Corp.*, 704 F. Supp. 318, 319 (D.N.H. 1989) (citations omitted). Strict products liability requires an allegation of a defect associated with a product which makes the product unreasonably dangerous and causes the injury for which recovery is sought. When Plaintiffs purchased a general entry wristband at Attitash, like Plaintiffs did for themselves and their children, they were not purchasing a product, but rather were paying for a service. That service included the provision of rides and access to Attitash's summer attractions, including the Airbag Jump at Attitash. There was no product

14

received as part of that transaction, and thus the Attitash Defendants are entitled to summary judgment on Plaintiffs' Count II strict products liability and defective design/defective product claim.

Additionally, even if a strict products liability and defective design/defective product claim could apply to a service like the Attitash Defendants' and not just a product, Plaintiffs' strict products liability claim is barred because Plaintiffs' daughter, A.J., misused the Airbag Jump attraction. *See Chellman v. Saab-Scania AB*, 138 N.H. 73, 81 (1993) ("In a strict products liability case, misconduct by the plaintiff may be an affirmative defense."); *Cyr v. J.I. Case Co.*, 139 N.H. 193, 207-09 (1994) (same); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 812-13 (1978) (recognizing "plaintiff's misconduct" as a defense to a products liability claim). Causation is a required element of a strict liability claim. *See LeFavor v. Ford*, 135 N.H. 311, 313 (1992); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 806-09 (1978). When one uses the Airbag Jump, they are supposed to propel themselves out from the jump platform, toward and onto the airbag below. A patron using this service/summer attraction offered by Attitash is not ever expected or told to grab onto any part of the scaffolding structure. To the contrary, they are specifically told not to do so. *See* Ex. B, Attitash sign photographs. Such action by a patron constitutes misuse of the attraction. Thus, A.J. misused the Airbag Jump attraction, and even if the Court were to allow Plaintiffs to proceed with their strict products liability claim relative to this service (which it should not), the Attitash Defendants would be entitled to summary judgment on the claim on the grounds that Attitash's airbag service was misused by A.J.

### F. Enhanced Compensatory Damages Are Not Recoverable By Plaintiffs Under the Facts of This Case.

In prayer for relief B in their Complaint, Plaintiffs request an award of "enhanced compensatory damages." A request for such damages does not appear anywhere else in the

15

Complaint, but to the extent Plaintiffs' Complaint can nevertheless be construed as seeking an award of enhanced compensatory damages, the Attitash Defendants are entitled to summary judgment on that request as Plaintiffs are not entitled to recover any such damages under the undisputed facts of this case.

Enhanced compensatory damages are awardable "when the act involved is wanton, malicious, or oppressive." *Panas v. Harakis*, 129 N.H. 591, 608 (1987) (*quoting Vratsenes v. N.H. Auto, Inc.*, 112 N.H. 71, 73 (1972)). However, under New Hampshire law, enhanced compensatory damages "are awarded only in exceptional cases, and not even in every case involving an intentional tort." *Figlioli v. R.J. Moreau Cos.*, 151 N.H. 618, 621 (2005); *see also Stewart v. Bader*, 154 N.H. 75, 87 (2006). There is no intentional tort claim, pled or conceivable, against either of the Attitash Defendants. (*See generally* Complaint.)

In order to recover enhanced compensatory damages, the defendant must have acted with "ill will, hatred, hostility, or evil motive" or in some other manner engaged in "wanton, malicious, or oppressive conduct." *Munson v. Raudonis*, 118 N.H. 474, 479 (1978); *see also id.* ("Instead of allowing an award of damages to be based on implied or legal malice, we prefer to base such an award only on a showing of actual malice."). "Without such a showing, the mere commission of a tort will not give rise to the aggravated circumstances necessary for the award of liberal compensatory damages." *Id.*; *see also Figlioli*, 151 N.H. at 621 (noting that enhanced compensated damages are "sometimes called liberal compensatory damages").

There is no allegation in Plaintiffs' Complaint, in Plaintiffs' liability expert's report, and there was no evidence in any of the recent depositions, to support any claim that either of the Attitash Defendants acted in any way that amounts to "ill will, hatred, hostility, or evil motive." *See Munson*, 118 N.H. at 479; *contra Stewart*, 154 N.H. at 76-77, 87 (defendant shot his wife in

16

the head in furtherance of a deliberate and premeditated plan); *Aubert v. Aubert*, 129 N.H. 422, 424-25 (1987) (wife shot her husband in the face from less than two feet away, and was later convicted of attempted murder).  Plaintiffs' primary claim against the Attitash Defendants is one of negligence.  Under the facts of this case, both as alleged and revealed through discovery, the Attitash Defendants are entitled to summary judgment on Plaintiffs' claim for an award of enhanced compensatory damages.

### G. Plaintiffs Do Not Claim Personal Emotional Distress Damages and Have No Basis for Seeking Such Damages.

Finally, Plaintiffs' Complaint is ambiguous and potentially attempts to reserve a right by Plaintiffs to articulate a claim for emotional distress damages for witnessing their daughter's accident.  Plaintiffs' Complaint, at paragraphs 49, states that Scott and Cindy Johnson are entitled to recover "medical expenses and other losses they incurred as a result of A.J.'s injuries and damages."  (*See also* Complaint ¶¶ 60, 69.)  Such scant references to "other losses" are not elaborated on anywhere else in the Complaint.  At their recent depositions, on October 18 and 19, 2018, Scott and Cindy Johnston testified that they are not making any claim for their own emotional harm.  Thus, the Attitash Defendants are also entitled to summary judgment on those putative damages claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants L.B.O. Holding, Inc., d/b/a Attitash Bear Peak Resort and Attitash Resort, and Peak Resorts, Inc., d/b/a Attitash Bear Peak Resort and Attitash Resort, respectfully request that this Honorable Court grant summary judgment for the Attitash Defendants on:

(a) all of Plaintiffs' claims on the grounds of lack of causation and/or expert support;

(b) Plaintiffs' Count II strict products liability and defective design/defective product claim on the grounds that the provision of the Airbag Jump attraction was a service (as opposed to a product) and, separately, their daughter misused the attraction;

(c) Plaintiffs' Count III CPA claim on the grounds of lack of causation;

(d) Plaintiffs Scott and Cindy Johnson's putative claim for emotional distress damages on the grounds that they have insufficiently claimed those damages and have testified they do not claim those damages; and

(e) Plaintiffs' claim for enhanced compensatory damages on the grounds that they are not recoverable by Plaintiffs under the facts of this case.

Respectfully submitted,

L.B.O. Holding, Inc., d/b/a
Attitash Bear Peak Resort and Attitash Resort

and

Peak Resorts, Inc., d/b/a
Attitash Bear Peak Resort and Attitash Resort

By Their Attorneys,
DEVINE, MILLIMET & BRANCH, P.A.

Dated:  October 24, 2018        By:   /s/ Jonathan M. Eck
Thomas Quarles, Jr., Esq. (NH Bar #2077)
Jonathan M. Eck, Esq. (NH Bar #17684)
111 Amherst Street
Manchester, NH  03101
(603) 695-8641
tquarles@devinemillimet.com
jeck@devinemillimet.com

## CERTIFICATE OF SERVICE

I, Jonathan M. Eck, certify that on this date service of the foregoing document was made upon counsel of record via the Court's CM/ECF System.

Dated:  October 24, 2018                              /s/ Jonathan M. Eck
                                                                       Jonathan M. Eck, Esq. (NH Bar #17684)