UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Scott and Cindy Johnson, Individually & as Parents & Next Friends of minor A. J., <br><br> PLAINTIFFS <br><br> v. <br><br> L.B.O. Holding, Inc., d/b/a Attitash Bear Peak Resort & Attitash Resort; <br><br> Peak Resorts, Inc., d/b/a Attitash Bear Peak Resort & Attitash Resort; <br><br> Ross A. Stevens, d/b/a Stevens Engineering; <br><br> Bounce Back, LLC, d/b/a U.S. Airbag; and <br><br> U.S. Airbag, LLC, d/b/a U.S. Airbag; <br><br> DEFENDANTS | Civil Action No.: 1:17-cv-277-AJ <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF OBJECTION AND RESPONSE TO DEFENDANTS L.B.O HOLDING, INC. AND PEAK RESORTS, INC.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS

Plaintiffs submit this memorandum of law in support of their objection and response to Defendants L.B.O. Holding, Inc. or and Peak Resorts, Inc.'s Motion for Summary Judgment on Plaintiff's Claims ("Objection"). Supporting affidavits filed herewith or previously in this action are cited in support of Plaintiff's Objection. Depositions of several LBO employees were taken on November 15 and 16, but transcripts have not yet been prepared.

**I.    INTRODUCTION**

On July 3, 2014 A.J. then, nine years old, was seriously injured on the Airbag Jump, one

of several outdoor summer attractions owned and operated by Defendant LBO Holding, Inc. ("LBO" or "Attitash") at its Attitash Resort in Bartlett, Defendant N.H. Peak Resorts Inc. ("Peak Resorts") owns all shares of LBO, along with several other ski resorts. Doc. 7; John Lowell Dep. Transcript, not yet available. Collectively LBO and Peak Resorts are referred to as "Attitash Defendants". The Airbag Jump attraction is considered a homemade device regulated as an amusement ride under N.H. Law. RSA 358-A; Saf -C 1400. It consisted of two main components: an airbag system and a tower scaffolding system. The airbag supplied by US Airbag consisted of a main inflatable 50' by 50' airbag weighing 1,200 pounds (in other words, it cannot be moved easily), cover sheets, blower fans and tether/anchors. The scaffolding system supplied by a scaffolding company to Attitash consisted of a tower approximately 38' high in total used to provide two jump platforms at heights of approximately 20' and 33'. The tower was secured to the ground by cables. The bag and tower were surrounded by a chain link fence with an entrance and exit gate.

## II. MATERIAL FACTS IN A LIGHT MOST FAVORABLE TO PLAINTIFFS SUPPORTIVE OF PLAINTIFFS' CLAIMS

The Airbag Jump as summer attraction at Attitash was first opened to the public in May 2013. Doc. 47-9 through 47-11. By June 2013 Attitash had already reported a serious accident on the ride to DOS. Ex. 47-13 & 14. This involved what may be referred to as pencil dive type accident where a jumper lands feet first instead of in a legs extended position as if sitting on a floor. Id. On August 17, 2013, they had another serious accident on the Airbag Jump involving a 34-year-old which was very similar to the accident A.J. would have about 11 months late on July 3, 2014. Doc 6 ¶ 29; Doc. 47-18. Attitash described the accident as follows in its report to the N.H. Department of Safety, Division of Safety Services, Tramway and Amusement Ride Safety Bureau ("DOS"): "Guest went to jump – got to edge of platform but hesitated and grabbed rail: rotated

2

and landed on head." Id. This may be referred to as an aborted take-off type of accident in which the jumper instinctively out of a fear of heights aborts jumping at the edge of the jump platform and inadvertently grabs onto to reachable/grabbable scaffolding post or rail and falls underneath the jump platform. As required by Saf-C 1405.04 DOS conducted inspections after both accidents and made the following recommendations to Attitash regarding the latter accident.

> Following an incident on 8-17-2013, the ride was reviewed.
>
> Recommendations:
>
> 1. Tape jumping lanes [ illegible] to ends of platform.
> 2. Possibly cover corner posts with something that is not easily grabbed by participants.
> 3. Consider giving participants something to hold in their hands – as discussed.

Doc. 6 ¶ 30; Doc. 47-19. With regard to this similar aborted takeoff type of accident, Attitash dismissed the State's recommendations and did not even consult with any engineer about the State's recommendation or review with an engineer its compliance with N.H.'s Amusement Ride safety regulations in light of the accident experience. Miller Aff. ¶ 7.

The Airbag Jump tower had two cantilevered jump platforms that extended out from the base structure of the tower a total of 5 feet. If the air bag is pulled away from the base of the tower to any extent the minimum operational requirements of the Airbag Jump cannot be met. Doc. 47-17 ¶10, including among other diagrams a diagram of the tower in middle row, second from left, which shows a side view of tower and 5' wide cantilevered platform.

Stevens Engineering in reviewing the Airbag Jump in July 2013 noted in communications to Attitash that: "Owner shall verify that the jump platform(s) overhang the edge of the air Bag by a minimum of 5ft." Doc. 47-16 at 7, ¶1. They also noted one of Attitash's responsibilities was to

3

"Develop a daily /periodic inspection log". Doc. 47-16 at 6, ¶3. Attitash ignored their responsibility to make and maintain daily inspection reports prior to A.J.'s accident. Nevertheless, Attitash continued to operate the ride and marketed the Airbag Jump ride as providing "SOFT LANDINGS FOR SUPERHEROES" by prominently displaying the motto on the cover of the bag next to the entrance gate to the attraction, and on the opposite corner as well. Doc. 6 ¶17; Doc. 46-3, Miller Aff. ¶ 8 at 16. The 2014 Attitash marketing brochure touted that the Airbag Jump was "designed to give you a soft landing" and stated "feel the rush of making a freefall jump from as high as a three story building into a 60-by-60 foot airbag". Doc. 50-5 at 23.

When the state inspected the amusement ride at the start of the 2014 season on May 20, 2014, they advised Attitash to "update operations manual to reflect any changes/updates." Doc. 47-20.

The Johnsons on July 3, 2014 first checked into the hotel at the Attitash Resort. They later purchased afternoon tickets at Attitash to experience the summer attractions and ride the amusement rides of their choice. Scott Johnson had viewed Attitash website prior to the visit. Doc. 50-2 at 7. They observed the Airbag Jump as they used the nearby water slide ride. Doc. 50-2 at 9. A.J. and her brother wanted to go on the Airbag Jump. Id. A.J. made two attempts at jumping from the lower platform but was hesitant and came back down from the jump platform without jumping. On the third attempt she got to the very edge of the jump platform and hesitated again. This time she grabbed the vertical scaffolding post at the very end of the cantilevered jump platform, the one that is supposed to be extended a minimum five feet over the airbag. She could not hold on as her hand slid down the post and it met a horizontal crossbar. Doc. 46-5 at 14 & 15. As she lost her grip on the post her swinging momentum eased as she fell downward. Id. at 15&16. LBO employees reported she hit the pavement or side of the airbag and immediately the ground.

Miller Aff. ¶ 6e, Ex.14. She obviously did not have a soft landing as she suffered multiple depressed skull fractures, among other injuries. Ex. 3, C. Johnson Dep. Tr. 175.

Attitash admittedly operated the ride in 2014 for over six weeks prior to A.J.'s accident without conducting daily report documented inspections of the ride as required by N.H. safety regulations. See Saf-C 1404.02. Following A.J.'s accident at Attitash, LBO filed an "Amusement Ride Accident Report" with the N.H. Department of Safety (dated July 4, 2014 - the day after the accident) as required by law. See Saf-C 1405.04(i), Doc. 47-21 p.3. The official report stated the following:

> Has this ride been inspected pursuant to Saf-C 1404.02?    Yes X
>
> Date of last inspection: Tuesday May 20, 2014
>
> Inspector: Bryan Desgroseilliers

The same form listed its employee Bryan Desgroseilliers as the physical operator in charge of the Airbag Jump at the time of the accident. Consistent with that official report Attitash Defendants have failed to produce any daily inspection reports, maintenance logs or repair logs in their automatic disclosures or in responses to plaintiff's specific discovery requests. Miller Aff. ¶ 8, Ex. 19.

Following the accident, in accordance with Saf-C 1405.04 the ride was shut down and the State inspected it the next day on July 4, 2014. At that time the State's inspector completed an Amusement Ride/Device Review Form stating the following:

> Following an incident on 7-3-2014 that resulted in a head injury the ride was reviewed with particular focus on the design of launch/jump platforms. It was identified that a potential hazard exists if a participant grabs the rail/post as he/she jumps form the platform. The ride shall remain closed to the public until appropriate measures are taken to minimize the risk of this happening. In addition, padding is recommended on the asphalt near the base of the structure in the event that a participant exits the bag awkwardly. Please call for re-inspection prior to re-

opening.

Miller Aff. ¶ 4h, Ex. 8. Photographs taken by the State inspectors in their post-accident investigation show that the deflated airbag was pulled away a considerable distance from the base of the scaffolding tower. Doc 46-7 at 13; Miller Aff. ¶ 4, Ex 1-3, 5-7.

On July 6, 2014, the ride was inspected after remedial actions were taken and had been reviewed by Stevens Engineering. Chief Inspector Lockwood completed another Amusement Ride/Device Review Form dated July 6, 2014 which stated the following:

> Following the incident on 7-3-2014 Revisions were implemented to the Jump Platforms and reviewed by Stevens Engineering:
>
> 1. Fencing on stairs required to meet ASTM Standards – 42" high, no more than 4" opening.
> 2. Provide Daily Pre-Operational Inspections.
> 3. Recommend protection for ground and scaffolding structure, and to move airbag base under overhang as much as possible.
>
>     OK To Reopen Ride.

Miller Aff. ¶ 4k, Ex. 11.

On July 7, 2014 the State's Chief Inspector Lockwood emailed John Lowell at Attitash. Among other things he stated:

> I know we discussed the daily inspection; in addition to this, please keep a maintenance log. Regarding the daily inspection, the original letter from Stevens Engineering contains a list of items that should be included on the pre-operational inspection.

Miller Aff., ¶ 6f, Ex. 17. The Airbag Jump ride was allowed to open again only after remedial action was taken to cover the scaffolding post and rails on the jump platform so a jumper could not grab hold of them in an aborted take-off accident. Miller Aff. ¶ 4d, Ex. 4.

6

## III. STANDARD OF REVIEW

Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, this Court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The Court must then determine "whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). Material facts are "facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The moving party bears the burden of demonstrating that there is no material fact in issue, when viewed in the light most favorable to the non-moving party. Id.; Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).

Furthermore, "provided that the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment." Velazquez-Garcia v. Horizon Lines Of Puerto Rico., Inc., 473 F.3d 11, 18 (1st Cir. 2007). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (Citations Omitted).

## IV. PLAINTIFFS' CLAIMS SURVIVE SUMMARY JUDGMENT

### A. Plaintiffs' Claims Are Supported by Abundant Causation Evidence.

The Attitash Defendant as the owners and operators of the Airbag Jump ride had the

responsibility for the safe installation and safe operation of the attraction. Saf-C 1402.02 and 1402.03. The Attitash Defendants had knowledge of the risks of the Airbag Jump amusement ride much superior to plaintiffs but despite its accident history continued to market the summer attraction to jumpers of all ages and represented that it provided "soft landings" for the "superheroes" that it attracted to go on the ride. They knew that they had experienced a similar accident to A.J.'s accident in their very first summer of operation. They then ignored the state's recommendations following that earlier accident to cover the corner posts of the jump platforms with something not so easily grabbable. Doc. 47-19. They did not even provide Stevens Engineering with information about that accident. Miller Aff. ¶ 7, Ex. 18. If they had taken remedial measures after the prior accident, as recommended by the state, she would not have been able to grab the pole and she would not have fallen downward, missing the airbag. Further, if the airbag had been properly placed against the scaffolding she would not have been able to land on pavement. See Davidson and Miller Affidavits regarding Attitash employee statements of where A.J. landed and was found post-accident.

Plaintiffs have disclosed an Expert Report of Corey Andress. See Doc. 46-7. He opined that Attitash's failure to alter the jump platform walls following the August 17, 2013 accident was improper, failed to meet the standard of care, and caused A.J.'s fall to the ground. *Id*.

### B. Plaintiffs' Consumer Protection Act Claims in Count III Are Supported by Ample Evidence.

The N.H. Consumer Protection Act offers important protections to purchasers and users of services as wells as goods. The Attitash Defendants provide no affidavits claiming that their Airbag Jump was in fact actually operated on July 3, 2014 in accordance with applicable owners' manuals, manufacturer's instructions, engineer's recommendations, and applicable N.H amusement ride regulations and incorporated ASTM standards. They do not claim that the airbag

8

contained any air pressure gauge or other system of operation which objectively measured whether the airbag had sufficient air in it to ensure a "soft landing" before a jumper leaped off the jump platform. If overinflated the air bag could bounce jumpers off onto the pavement or ground for a hard and injurious landing. If underinflated a jumper's landing on a deflated bag could cause impact with the hard ground or pavement surface beneath the airbag by not sufficiently breaking the jumper's fall. Indeed, some images of the Airbag Jump apparently show the Airbag Jump being operated in 2013 prior to A.J. accident with the airbag substantially underinflated at the corner and edge of the airbag next to entrance gate and under the jump platform while a jumper is in midair. Miller Aff. ¶ 6b, Ex. 15. (Photo image produced by Attitash in discovery labeled 7-5-13)

The Airbag Jump at Attitash nevertheless used a cover on the air bag boldly emblazoned with the statement "SOFT LANDINGS FOR SUPERHEROES". Doc. 46-3 and Attitash response to Interrog. 17, Miller Aff. Ex. 19. A 2014 Attitash brochure marketing all its summer attractions promoted the Airbag Jump stating that the Airbag Jump, and not merely the airbag, was "[d]esigned to give you a soft landing". Doc. 50-5 at 23, ¶ 5. It also falsely claimed that the ride involved a jump onto a "60-by-60 foot airbag" when in fact the airbag was only 50 feet by 50 feet. Id. ; Doc. 47-12 at 5. A U.S. Airbag Owner's Manual touted the same marketing message. Doc. 47-12 at 20.

As operated by Attitash on July 3, 2014, however, the Airbag Jump at Attitash was not designed to give one a soft landing since it did not overhang the airbag the required 5 feet as specified by the manufacturer of the airbag component and also specified by Stevens Engineering and did not prevent grabbing a post and missing the airbag. Doc. 47-12 at 6, Doc. 47-17 at 14. This is underscored by the findings and recommendations of the N.H. Department of Safety amusement ride inspectors requiring daily inspections highlighting the need for daily

9

inspections and the need to be sure that the airbag is fully under the jump platform. Miller Aff. ¶ 4k, Ex. 11.

The Attitash Defendants are liable under the New Hampshire Consumer Protection Act (CPA), because they misrepresented the nature of the landing the amusement ride consumer would experience when using the Airbag Jump summer attraction. RSA 358-A. Under RSA 358-A:2, any person who engages in an unfair or deceptive act or practice in trade or commerce within the state is subject to liability. In this case, the Defendants' characterization of the soft nature of the landing was clearly false, given how the attraction was set up. This is contrary to the express representations made by the Defendants. There is a great deal of risk to using this attraction, and a high probability that users will not experience the kind of soft landings the Defendants promised. This representation is directly connected to injuries the Plaintiff sustained when she used the attraction and suffered a grave injury.

Under the New Hampshire CPA, the plaintiff must prove that "1) the defendant is a person; 2) the defendant used an unfair method of competition or a deceptive act or practice; and 3) the act occurred in trade or commerce." Milford Lumber Co. v. Rcb Realty, 147 N.H. 15, 20 (2001). Here, there can be no dispute as to the fact that the Defendants are collectively a person under the statute, nor that the Defendants engaged in commerce within the state. Thus, the only disputed prong of the test is whether the act in question is a deceptive act or practice. In determining what constitutes an unfair act under the statute, New Hampshire courts apply the so-called "rascality" standard, which states, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Barrows v. Boles, 141 N.H. 382, 390 (1996). Furthermore, when assessing claims under the CPA, courts rely on the plain meaning of the statute, and generally do not read terms

into the text which are not present. *See* <u>Milford Lumber Co., Inc.</u>, 147 N.H. at 18.

In <u>Beer v. Bennet</u>, the court found that an automobile dealer's online car advertisements violated the CPA, even though he lacked actual knowledge that the advertisement contained false information. <u>Beer v. Bennett</u>, 160 N.H. 166, 168 (2010). In that case, the defendant posted an advertisement online regarding a car for sale, which stated the car had "pretty vigorous performance." <u>Id.</u> The defendant advertised this, despite the fact he had never driven the car and knew nothing of its performance. <u>Id.</u> When the car was delivered and would not run at all, the plaintiff brought suit, and the court found that this was more than a mere breach of contract dispute. <u>Id.</u> at 171. The delivery of a car in non-working condition was a breach of contract, but the court held the representations about the car prior to sale was enough to invoke liability under the CPA. <u>Id.</u>

Distinguishing the case from <u>Kelton v. Hollis Ranch</u>, 155 N.H. 666 (2007) (where the court found a defendant not liable under the CPA for selling a horse under the mistaken belief it was a gelding because even an expert veterinarian would have been unable to discover the truth at the time of sale) the court differentiated between "good faith mistakes" and "cavalier attitudes." <u>Id.</u> The court found that the defendant in *Bennett* knew it did not have sufficient knowledge to make statements regarding the quality of the car and thus, had a "reckless disregard for the truth of his statements" satisfying the "degree of knowledge or intent required by *Kelton*." <u>Id.</u> citing <u>Snierson v. Scruton</u>, 145 N.H. 73 (2000).

In this case, the Defendants made misrepresentations about the nature of the landing the Plaintiff would experience, and they should have known that there was a significant risk the statement was false. If they did not know, it was due to a cavalier attitude and reckless disregard for the truth. The Defendants did not provide the Plaintiff with a soft, safe landing when she

used the Air Jump, which constitutes a violation of the statute. This is distinguishable from mere negligence, because the Defendants also represented to the Plaintiff before she used the ride that she would have a soft landing. They did so knowing that a previous consumer of the ride had suffered serious injury from a similar aborted takeoff accident in which a last second fear inadvertently caused the consumer to grab railing next to the jump platform. Even if the Defendants did not know that the Plaintiff would not experience a soft landing, they should have known it was a significant risk, as the airbag was not positioned according to the engineer's recommendations, and there is a track record of people experiencing harm on the Air Bag Jump. Furthermore, representing that a jump of over 20 feet from the air will include a soft landing, and then not providing that landing to those who use it, is the sort of misrepresentation "that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. at 171.

The Defendants argue they may escape liability under the CPA because they claim that Plaintiff's father admitted he did not affirmatively rely on their deceptive advertisements. The Defendants claim that because of this admission, the Plaintiff cannot show a causal connection between the advertisements and the harm suffered by A.J. The Defendants seem to conflate causation and reliance. The Defendants cite to Mulligan v. Choice Mort. Corp, USA (Mulligan), for the proposition that the Plaintiff had to affirmatively rely on the advertisements in question, however that is not the holding of Mulligan. The full text of the quote cited by the Defendants reads as follows:

> For such conduct to be actionable, the plaintiff need not show that he or she actually relied on the deceptive acts or practices, or that actual confusion or misunderstanding resulted. Rather, a CPA plaintiff need only establish a causal link between the conduct at issue and his or her injury.

Mulligan v. Choice Mortg. Corp. USA, 1998 U.S. Dist. LEXIS 13248, at *35 (D.N.H. Aug. 11,

12

1998); see also RSA 338-A:10, I (conferring right to bring private action under CPA to "any person injured by another's use" of unfair or deceptive acts or practices) (internal citations omitted). The purpose of this act is not only to protect those individual consumers harmed by unscrupulous business activities, but to protect all New Hampshire consumers. See Milford Lumber Co., 147 N.H. at 20 ("The legislature promulgated the Act to protect citizens engaged in commerce from this type of activity"). This is also consistent with the plain reading of the statute, which confers standing to any person injured by another's use of these unfair practices, and notably does not contain any reference to reliance in the statute. See Id. at 17 (for the proposition that the court will not read terms into the statute which are not there). Thus, the CPA does not require a direct showing that the advertisement caused the Plaintiff to use the service provided by the Defendants, only that there is a connection between the nature of the deceit, and the specific harm suffered by the Plaintiff.

   This principle was illustrated in Mulligan, where the court was tasked with certifying a class action lawsuit, dealing with several charges, against a mortgage lender. Mulligan, 1998 U.S. Dist. LEXIS at 1, 2. The plaintiffs in that case alleged that the defendant's unfair practices caused the plaintiffs to agree to interest rates far above what is ordinarily available. Id. at 3. The defendant attacked the certification of the class, arguing that in order to be successful in a CPA claim, the plaintiff would need to show that each individual member of the class relied upon the deceitful acts of the defendant in securing their loan. Id. at 33-34. The court rejected this claim, stating that the plaintiffs would only need to show a link between the individual plaintiff's higher than acceptable interest rates and the practice of locking individuals in at these high rates. Id. at 34-37. This causation element was expressly devoid of any reliance on the part of the plaintiff or plaintiffs, and only required a showing that the illegal acts were connected to the harm suffered

by the plaintiffs. Id.

> As noted above, the class members [plaintiffs] will not have to show that they relied on Choice's [defendant's] conduct in entering into their respective loan transactions. Moreover, no class member will have to show actual confusion or misunderstanding as a result of Choice's conduct. Rather, plaintiffs will have to carry a much less onerous burden, showing that their injuries (i.e., that they are locked into loans at interest rates higher than otherwise available) was a consequence of Choice's allegedly unfair and deceptive practices (i.e., securing for them loans at interest rates higher than otherwise available.)

Id. at 37. In that case, it is conceivable that many plaintiffs would be wholly unaware of the illegal acts perpetrated by the defendant until the existence of the lawsuit in question.

In this case, the Plaintiff need only show a causal relationship between the harm suffered and the unfair practices of the Defendants. The Plaintiff suffered great personal harm, because A.J. fell from the scaffolding and landed at least partly on the ground, causing severe injuries. The Defendants engaged in deceitful and unfair practices by guaranteeing to the world that their attraction would provide consumers with a soft landing. There is a clear link between a guarantee of a soft landing, and the harm of falling on a hard surface.

The Defendants also argue that the court should disregard the statement on the side of the Jump, because it "is printed on the side of the airbag and is a U.S. Airbag slogan, not a statement from either of the Attitash Defendants." (Defs' Mot. Summary Judgment at 11). However, it is irrelevant for the purposes of the CPA who printed the slogan, the fact is that the false statement on the side of the airbag was used by the Attitash Defendants. The CPA provides that it is unlawful under the act to "use" any deceitful methods, not that only those who printed the text be liable. It would be nonsensical if a party, ordinarily liable under the statute, could avoid liability just because they used a marketing company to craft slogans which misrepresented their services. It is the business entity, engaged in commerce in this state, who is ultimately liable for their deceit.

For the above reasons, the Defendants are not entitled to summary judgment on the issue of liability under the CPA, because the Defendants' advertisements deceived consumers as to the safety of their attraction, and that deceit is causally connected to the harm suffered by the Plaintiff.

### C. Enhanced Compensatory Damages Are Recoverable by Plaintiffs Given Attitash Defendants Repeated Disregard of Amusement Ride Safety Regulations and Standards of Reasonable Care.

The Attitash Defendants have provided no affidavits of their employees setting forth personal knowledge related to material facts and enhanced damages. It is the contention of Plaintiffs that the Attitash Defendants operated the Airbag Jump ride in flagrant disregard of reasonable standards of care and government safety regulations. They opened the Airbag Jump to the public before DOS had even initially inspected the airbag on May 31, 2013. Id., Doc. 47-11. and they operated it for weeks without following state directions conditioning its operation on compliance with instructions from Stevens Engineering. It was only in June 2013 that the Attitash Defendants finally supplied Stevens Engineering with all the operating manuals. Doc 47-12. Stevens Engineer noted for Attitash the daily inspection report requirement and the need to verify that the five feet cantilevered jump platforms overhang the airbag by a minimum five feet. Doc. 47-16 at 3, ¶4 on left side. U.S. Airbag required the same 5-foot minimum overhang. Doc. 47-16 at 10. Plaintiffs further contend that video taken of the Airbag Jump ride at Attitash in the summer 2013 show it being operated with the airbag pulled away from the scaffolding tower base and with a corner of the airbag deflated contrary to U.S. Airbag operating manual instructions. Miller Aff. ¶ 6b, Ex. 15. (Photo image produced by Attitash in discovery labeled 7-5-13) & Doc. 47-12 at 13, ¶ 4.

When a similar aborted take-off accident to A.J.'s accident occurred on August 17, 2013, they ignored the States' recommendations about covering the posts and giving jumpers something to hold in their hands without consulting Stevens Engineering or others. Indeed, they failed to even inform Stevens Engineering of the August 17, 2013 accident. Miller Aff. ¶ 7. Significantly, they utterly failed to keep any daily inspection reports prior to the accident although N.H. amusement ride regulations required it.

Following the accident involving A.J. they failed to document the accident scene before cleanup and state inspection. The state inspection did document that that airbag had been pulled away from the base of the tower as evidence by photos taken by DOS. Miller Aff. ¶ 4a, b, c, e, f, and g.

Such evidence of a reoccurring practice of ignoring safety concerns support when viewed in a light most favorable to Plaintiffs support a finding of enhanced damages.

### D. Plaintiffs Scott and Cindy Johnson Individually Do Not Claim Emotional Distress Damages in Their Individual Capacities.

Plaintiffs Scott and Cindy Johnson do not claim emotional distress damages in this action in their individual capacities. They do claim emotional distress damages on behalf of their minor child A.J. See Complaint at paragraphs 47 and 58.

Plaintiffs Scott and Cindy Johnson do claim medical expenses that they incurred for care of their minor child resulting from the accident. In addition, they are entitled to other consequential special damages caused by the accident and injuries to A.J. Instead of buying a vacation resort experience, they ended up purchasing a nightmare. They are entitled to reimbursement for the cost of the hotel reservation for their family hotel stay at Attitash for which they spent $444.26. As a result of the accident they were unable to use the hotel room as they stayed by their child's side in the pediatric ICU at Maine Medical center in Portland Maine. They are also entitled to the value

of Scott and Cindy Johnson's time and lost wages in providing psychological and emotional care and support and for their minor child during her emotional 6-day hospital stay, including three days in the pediatric intensive care unit. This includes the value of $2,317 for Scott Johnson's lost week of work.

### E. Plaintiffs' Claim of An Increased Risk of Future Complications from Her Serious Head Injury Is Supported By Professional Literature.

Plaintiff suffered depressed fracture of her skull and had cerebrospinal fluid leaking out of her ear. Ex. 3, C. Johnson Dep. Tr. 175. Any subsequent head injury incident experienced by A.J. could require further reevaluation by her doctors. As part of Plaintiffs' expert disclosure notice has been given of the possible testimony of her treating physicians as to this higher risk of complications from her serious head injury and any future head trauma. Doc. 47-22. This is demonstrated in part by professional literature provided to opposing counsel with Plaintiffs' Expert disclosure. See <u>Chronic Traumatic Encephalopathy: Neurodegeneration Following Repetitive Concussive and Subconcussive Brain Trauma</u> (May 2012), DOI: 10.1007/s11682-012-9164-5, https://www.ncbi.nlm.nih.gov/pubmed/22552850 (last accessed on 11/27/2018); and <u>Head Injury As Risk Factor For Psychiatric Disorders: A Nationwide Register-Based Follow-Up Study of 113,906 Persons With Head Injury</u>, American Journal of Psychiatry (April 17, 2014), DOI: 10.1176/appi.aip.2013.13020190.
https://www.ncbi.nlm.nih.gov/pubmed/24322397(last accessed on 11/27/2018)

### F. The Strict Liability and Defective Design Claims Alleged in Count II Against Attitash Defendants Survive Summary Judgment

Plaintiffs allege tort claims based on strict liability and defective design in Count II. The Attitash Defendants have provided no affidavit declaring that they did not sell something to the Johnsons. They do admit in their motion that the Johnsons were sold general wristbands that

17

allowed them to use the Airbag Jump. They do argue that the Airbag Jump use experience sold to the Johnson family on July 3, 2014 was not a product, but a service.

The Attitash Defendants are considered the manufacturer of this homemade Air Jump amusement ride by N.H. safety regulations. Saf-C 1401.121. An engineer LBO contracted with told them that. Doc. 47-17 at 2. LBO itself purchased the airbag component and systems scaffolding tower component separately from different suppliers and then assembled and combined them together at Attitash as a summer amusement ride attraction.

Plaintiffs nevertheless recognize that N.H. law to date has not extended strict products liability to a service. The Plaintiffs submit that they have a greater burden of proof here on its negligence claim over a strict liability claim. The N.H. Supreme Court has in dicta recognized that the presence of an unfair burden being placed on an injured plaintiff may potentially present a basis for extending strict liability to a service. Cf. Siciliano v. Capitol City Shows, Inc., 124 N.H. 719, 730 (1984).

Why should a child injured on an inflatable devise amusement ride purchased by the child's family be afforded strict liability protections while one who only purchased a single afternoon's amusement ride experience be required to meet the additional burdens of proving negligence? In either case the same defect causes the injury: the improper positioning of the air bag component in relation to the jump tower and jump platform and the failure to take readily available measures (e.g. cover the posts) to avoid the reasonably foreseeable risk of a jumper instinctually grabbing onto a post on the jump platform at the last second because of a fear of heights. Why should one victim be entitled to greater protection than the other?

In any event, assuming arguendo that what the Attitash Defendants sold to Plaintiffs in relation to an amusement ride was a service, rather than a product, Plaintiffs submit there is no

good reason why strict tort liability remedy should not be available to Plaintiffs under the facts of this case. First of all, the line between what is a product and what is a service may not always be well defined. Secondly, the distinction between the greater protections offered by strict liability allotted those injured by something defined as a product versus a service is not justifiable.

The manner of use here does not bar liability. The attraction of the ride is the lure to face one's fear of heights and free falling in safe environment. A.J.'s use of the amusement ride and her inadvertent, instinctual hesitancy and reaching out at the last second to grab an available post at the end of the jump platform was reasonably foreseeable to Attitash. They had already experienced a similar serious accident in the few months they had operated the ride. They unilaterally chose to dismiss the State Amusement Ride inspectors' recommendations to address this very risk.

## V. CONCLUSION

The Attitash Defendants' Motion for Summary Judgment should be denied for the reasons cited above.

Respectfully Submitted,

SCOTT AND CINDY JOHNSON, INDIVIDUALLY AND AS PARENTS AND NEXT FRIENDS OF MINOR CHILD, A.J.

By their attorneys,
HAGE HODES, P.A.

Date: 11/27/2018          By:   /s/ Douglas J. Miller
                                Jamie N. Hage, Esq. (NHB #1054)
                                Douglas J. Miller, Esq. (NHB #1756)
                                Kathleen A. Davidson, Esq. (NHB #19535)
                                Hage Hodes, Professional Association
                                1855 Elm Street
                                Manchester, NH 03104
                                (603) 668-2222
                                jhage@hagehodes.com
                                dmiller@hagehodes.com
                                kdavidson@hagehodes.com

CERTIFICATION

I, Douglas J. Miller, hereby certify that on this 27th day of November 2018, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Douglas J. Miller